Marlowe POWELL,
Plaintiff-Respondent,

v.

NORMAN LINES, INC.,
Defendant-Appellant,

and

Bi-State Development Agency,
Defendant-Appellant.

Nos. 46636, 46637.

Missouri Court of Appeals,
Eastern District,
Division Two.

June 12, 1984.

Motion for Rehearing and/or Transfer to
Supreme Court Denied
July 12, 1984.

Application to Transfer Denied
Sept. 11, 1984.

192

Brown, James & Rabbitt, Gray & Ritter, St. Louis, for defendants-appellants.

Myron S. Zwibelman, St. Louis, for plaintiff-respondent.

PUDLOWSKI, Judge.

Respondent Marlowe Powell brought this action for damages arising out of a collision between a tractor trailer owned by appellant Norman Lines, Inc. and a bus owned by appellant Bi-State Development Agency. Bi-State and Norman Lines both filed cross claims for apportionment of fault. Bi-State also filed a cross claim for property damage done to its bus. The trial court sitting with a jury returned a verdict in favor of Marlowe Powell in the sum of $13,500.00 apportioned equally between the two appellants. The jury also returned a verdict in favor of Norman Lines on Bi-State's cross claim for property damages. We affirm.

The collision which is the subject matter of this action occurred on January 30, 1979 at the intersection of St. Louis Avenue and Kingshighway in the City of St. Louis. At the time of the collision, Norman Lines' truck was traveling south on Kingshighway and was driven by Darren Mask. Bi-State's bus was traveling east on St. Louis Avenue and was driven by Alfred Brame. Respondent Marlowe Powell, a passenger on the bus, brought suit for personal injuries which he sustained as a result of the collision.

At the trial, Alfred Brame, the bus driver, testified that just prior to the accident he had stopped because the light for St. Louis Avenue was red. At this time, Mr. Brame first noticed Norman Lines' truck which was about one block north of the intersection. When the light for St. Louis Avenue turned green, Mr. Brame testified that he started into the intersection. At this time, he testified that he looked to his left and saw the truck 150–200 feet away moving at 50 m.p.h. Witnesses Yvonne Bowers and Nathaniel Cunningham testified that the speed of Norman Lines' truck was between 40–50 m.p.h.

Darren Mask, the truck driver, testified that he first noticed the Kingshighway traffic light when he was one half to one third of a block away from the intersection. He testified he was traveling around 15–20 m.p.h. The light then was green. Mr. Mask further testified that the light changed from green to yellow when he was 15 feet from the intersection. He decided to blow the truck's horn and go through the intersection.

Joe Anderson, a witness to the accident, was driving a station wagon and was stopped at the intersection alongside of the Bi-State bus. When the St. Louis Avenue light turned green, Mr. Anderson testified that he and the bus started to pull into intersection. Mr. Anderson further testified that he heard the truck's horn and was able to stop, however, the bus which had moved farther into the intersection was struck by the truck. He testified the truck was traveling 35–40 m.p.h.

Charles Buchanan, another witness to the accident, was also a passenger on the Bi-State bus. Mr. Buchanan was involved in a separate action against Bi-State arising out of the same collision. His deposed testimony was read into the record over Bi-State's objection by Norman Lines' counsel.

Mr. Buchanan was seated in the bus at a window seat on the bus driver's side. He testified he was able to see the light which was located on the northwest corner of the intersection and that he could see the condition of the light which controlled both traffic on Kingshighway and on St. Louis Avenue. When he boarded the bus, the light for eastbound traffic on St. Louis Avenue was red. Mr. Buchanan first saw the truck when it was coming past the liquor store which sits on the northeast corner of the intersection. When he observed that the truck was going to run the red light, he looked at the bus driver and it appeared to him that the driver was looking straight ahead. It was Mr. Buchanan's opinion that the bus driver was anticipating a green light and had entered the intersection by approximately five feet before the east-

bound light for St. Louis Avenue turned green.

In rebuttal, the trial court refused to permit Bi-State to introduce a tape and transcript of a conversation between Mr. Buchanan and its representative. Bi-State sought to introduce this evidence to impeach the statements made by Mr. Buchanan in his deposition.

In support of its cross claim for damage to its bus, Bi-State called Ralph Goesmann, an accident estimator for Bi-State. Mr. Goesmann testified that as a result of the collision, the bus had depreciated in value by $10,481.00. Over Bi-State's objection, the trial court permitted Norman Lines' counsel to cross-examine Mr. Goesmann regarding the number of accidents Bi-State's buses have in a week's time and the number of accidents their vehicles have in the course of a year.

Bi-State also called George Brown, an employee of the City of St. Louis Street Department. Mr. Brown testified that the intersection of St. Louis Avenue and Kingshighway was controlled by electric signals. He testified that when the Kingshighway light changed from green to yellow, it would remain yellow for a period of 3.4 seconds. When this light changed from yellow to red, the lights for both St. Louis Avenue and Kingshighway would remain red for a period of 1.7 seconds. Afterwards, the St. Louis Avenue light would turn green and the Kingshighway light would remain red for 37.4 seconds.

The respondent Marlowe Powell submitted his case on Bi-State's failure to keep a careful lookout and Norman Lines' violation of a traffic signal. Bi-State submitted its cross claim for damages on the alternative theories of the truck's excessive speed or the truck's violation of the traffic signal. Norman Lines submitted an affirmative defense instruction on the alternative theories of Bi-State's failure to keep a careful lookout or Bi-State's violation of the traffic signal.

The jury returned its verdict and found for the respondent and against both appellants, fixed respondent's damages at $13,-500.00, and assessed each defendant's relative fault at fifty percent. The jury also found for Norman Lines on Bi-State's cross claim for damages. The verdict forms reflected, however, that the jurors who signed the verdict form assessing relative fault were not the same jurors who had signed the verdict form finding both appellants liable.

Both appellants moved for directed verdicts at the close of respondent's case and at the close of all the evidence. The trial court denied these motions. Appellants also moved for a judgment notwithstanding the verdict, or in the alternative, for a new trial. These motions were also denied. This appeal follows.

We first address Norman Lines' appeal before this court.

Appellant Norman Lines argues that the trial court erred in submitting Instruction No. 14 to the jury on behalf of Bi-State on its cross claim for property damage. Norman Lines argues that Instruction No. 14 contained additional charges of negligence which did not appear in Marlowe Powell's verdict directing instruction, and as such necessarily created an impermissible submission of multiple theories of recovery. Norman Lines further argues that the submission of the two theories of negligence resulted in a confused and misled jury which returned a verdict against Norman Lines on Marlowe Powell's claim based upon some theory other than what was contained in Mr. Powell's verdict director. We disagree.

In reviewing the propriety of instructions submitted to the jury, we must view the whole of the evidence and all of the instructions in determining whether a party has been prejudiced by confusing or misleading instructions. The burden of proof rests upon the party challenging the instruction. *Wilson v. Bob Hood & Associates, Inc.*, 633 S.W.2d 738, 751 (Mo.App. 1981). "The criteria in determining whether an instruction is correct or fails is whether an average juror would correctly understand the applicable rule of law, and

whether a jury was not or could not be confused or misled, resulting in prejudice to one of the parties." *Id.* at 751.

In the instant case, Instruction No. 14 was the verdict director on Bi-State's cross claim against Norman Lines for property damage. This instruction conformed with M.A.I. 17.02 and hypothesized two separate disjunctive submissions of negligence on the part of Norman Lines: (1) that the driver of Norman Lines' truck violated the electric signal; or (2) that the driver of Norman Lines' truck drove at an excessive speed.

■ In light of the whole record, it is clear that each submission of negligence was supported by substantial evidence. Four separate witnesses testified to the speed of the truck and the color of the traffic signals at the time of the accident. These witnesses testified that the truck was traveling somewhere between 35 and 50 m.p.h. and that the truck ran a red light.

Moreover, the instant case involved both Marlowe Powell's claim for personal injuries and Bi-State's claim for property damage. The trial court properly prepared the instructions in package form. Instruction No. 7 instructed the jury that Instruction 7 through 12, plus the general instructions, applied to the Powell's claim for personal injury. Instruction No. 13 further instructed the jury that Instructions 13 through 17, plus the general instructions, applied to Bi-State's claim for property damage. In view of all the instructions, it is clear that those dealing with Powell's personal injury claim were separate from those dealing with Bi-State's property claim. It is also clear that there was no language present in the instructions which could confuse or mislead an average juror.

■ Norman Lines also asserts that the actions of Bi-State's driver were the sole and intervening cause of the collision and, therefore, the jury could not have found that Norman Lines' excessive speed contributed to Mr. Powell's injuries. We disagree with this reasoning. This argument ignores the fact that Mr. Powell's

verdict director against Norman Lines did not submit on excessive speed. Instruction No. 10 was Mr. Powell's verdict director against Norman Lines. This instruction set out that the jury could only find for Mr. Powell if it determined that the driver of the Norman Lines truck violated the traffic light. Further, by so arguing, Norman Lines is attempting to have this court replace the jury's determination of the facts with our own. Our function is not to decide conflicts in the evidence as to the course of the accident but to determine whether there was substantial evidence to support the verdict. *Smugala v. Compana,* 404 S.W.2d 713, 716 (Mo.1966).

Accordingly, we hold that the trial court did not err in submitting Instruction No. 14 to the jury.

We next consider Bi-State's appeal before this court. Bi-State predicates its appeal on three grounds. First, Bi-State argues that the trial court erred in overruling its objection to Norman Lines' cross-examination of Ralph Goesmann. Second, Bi-State contends that the trial court erred in submitting Norman Lines' Instruction No. 16 on contributory negligence. Last, Bi-State argues that the jury's verdict was legally impermissible because the jurors who found Bi-State and Norman Lines liable were not the same jurors who apportioned relative fault.

Appellant Bi-State argues that the trial court abused its discretion by overruling Bi-State's objection to the cross-examination of Ralph Goesmann by Norman Lines' counsel concerning the number of accidents Bi-State's buses are involved in on a weekly and yearly basis. Bi-State contends such evidence of other unrelated accidents was irrelevant and immaterial and only served to inflame and prejudice the jury against it. We disagree.

■ Our review of this question is limited by the well-settled rule "that the extent and scope of cross-examination in a civil action is discretionary with the trial court and its rulings in regard thereto will not be disturbed unless an abuse of discretion is clearly shown." *Stafford v. Lyon,*

413 S.W.2d 495, 498–499 (Mo.1967). "This is particularly true in the cross-examination of an expert witness, in which case a wide latitude is allowed to test his qualifications, credibility, skill or knowledge and the value and accuracy of his opinion." *Id.* at 499. Further, "[t]he trial court has some discretion to determine how far cross-examination shall proceed upon collateral matters which affect the skill, reliability, and credibility of the witness." *Rath v. Knight,* 55 S.W.2d 682, 685 (Mo.1932).

In the instant case, Bi-State called Ralph Goesmann, an accident estimator for Bi-State, as an expert witness. Mr. Goesmann testified on direct examination that the bus had depreciated in value by $10,-481.00 as a result of the accident. On cross-examination, Norman Lines' counsel was permitted over Bi-State's objection, to elicit the following information from Mr. Goesmann: (1) that Bi-State's buses are involved in about twenty to thirty accidents per week; (2) that Bi-State's buses are involved in approximately one thousand to fifteen hundred accidents over the course of a year; and (3) that four to five percent of Bi-State's buses are involved in accidents every week.

 The trial court did not abuse its discretion. Although Mr. Goesmann's testimony would be inadmissible to prove that the present accident occurred, it was not inadmissible to prove other matters. Norman Lines' counsel was not attacking Mr. Goesmann's qualifications as a witness. The questioning merely went to the witness' credibility and to the value and accuracy of his opinion regarding the bus' depreciation.

In Bi-State's action for damages against Norman Lines, the number of accidents involving its buses was relevant to the issue of depreciation. Mr. Goesmann's opinion of the value of depreciation was based on the value of a bus in perfect condition the same age as the one in the accident. The bus in the present case was eight years old. Mr. Goesmann had no personal recollection of the bus' appearance prior to the accident and, therefore, he had no knowledge whether the bus was in perfect condition or was previously damaged and repaired. In light of these facts, Norman Lines' counsel's questions concerning the number of accidents investigated by Mr. Goesmann was consistent with the remainder of his cross-examination and quite possibly elicited evidence from which the jury could have drawn a reasonable inference that Mr. Goesmann's estimate of depreciation was not entirely accurate.

Appellant Bi-State next argues that the trial court erred in submitting Norman Lines' Instruction No. 16 on contributory negligence because there was no substantial evidence to support such an instruction. Instruction No. 16, which was submitted on Bi-State's cross claim for damages, reads as follows:

> Your verdict must be for defendant Norman Lines, Inc. on defendant Bi-State's claim for damages if you believe:
> First, either:
> the driver of the Bi-State bus failed to keep a careful lookout, or the driver of the Bi-State bus violated the electric signal, and
> Second, the driver of the Bi-State bus in any one or more of the respects submitted in paragraph First, was thereby negligent, and
> Third, such negligence of the driver of the Bi-State bus directly caused or directly contributed to cause any damage defendant Bi-State may have sustained.

Bi-State argues that this instruction is improper because of all the evidence adduced at trial only Charles Buchanan's deposition reflected that Bi-State's bus entered the intersection before the St. Louis Avenue light turned green. Bi-State contends that this testimony in Charles Buchanan's deposition was not sufficiently probative on this issue to support Instruction No. 16. We disagree.

 On review, we must follow the axiom that "[e]ach element of a disjunctive contributory negligence instruction must be supported by substantial evidence, and the lack of such support on any one ren-

ders the submission erroneous." *Saupe v. Kertz*, 523 S.W.2d 826, 830 (Mo. banc 1975). "In determining whether an instruction has the necessary evidentiary support, the evidence is considered in the light most favorable to the defendant, disregarding plaintiff's evidence unless it tends to support the submission." *Wissman v. Wissman*, 575 S.W.2d 239, 240 (Mo.App.1978). Moreover, "a determination of contributory negligence is generally a matter for the jury. It is to be taken from them only if reasonable minds could not differ as to the existence or absence of negligence." *Id.* at 241.

■ Under the circumstances of this case, the trial court did not err in submitting Norman Lines' Instruction No. 16. There is ample evidence in the record to support the first disjunctive element that the driver of the Bi-State bus failed to keep a careful lookout. There is also evidence to the second disjunctive element that the Bi-State bus driver violated the electric signal. The fact that Charles Buchanan's deposed testimony was the only evidence specifically adduced on the issue that the bus violated the electric signal does not render it insignificant or unsubstantial. "In our review of a jury verdict, we do not determine the credibility of the witnesses, resolve conflicts in testimony, or weigh the evidence. These tasks are quite properly those of a jury." *Fowler v. Daniel*, 622 S.W.2d 232, 236 (Mo.App.1981).

Bi-State further argues that even if Charles Buchanan's deposed testimony is determined to be sufficiently probative on the issue of Bi-State's violation of the electric signal, the trial court still erred in permitting Norman Lines to read from the deposition over its objection because Bi-State did not have a full and fair opportunity to cross-examine Mr. Buchanan during the deposition. Bi-State also argues that the trial court erred by sustaining Norman Lines' objections to Bi-State's Exhibits Y and Z. Exhibits Y and Z were a taped conversation between a Bi-State representative and Mr. Buchanan and a typed transcript of that conversation. Bi-State sought to introduce these exhibits to impeach Mr. Buchanan's deposed statements.

■ Rule 57.07(a)(3)(D), which governs the introduction of deposition testimony at trial, provides:

> At the trial ... any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had proper notice thereof, ... that the witness resides out of the state.

Further, the decision to admit deposed testimony pursuant to Rule 57.07(a)(3) is one resting largely within the discretion of the trial court. *Taylor v. Laderman*, 349 Mo. 415, 161 S.W.2d 253, 257 (1942); *See Kunzler v. Estate of Kunzler*, 598 S.W.2d 139, 144–145 (Mo. banc 1980).

■ In this instance, the trial court did not err in permitting Norman Lines' counsel to read from Mr. Buchanan's deposition. Proper foundation for admissibility was laid. As a resident of East Saint Louis, Illinois, Mr. Buchanan was unavailable for trial as a matter of law. Counsel for both Bi-State and Norman Lines were represented at the deposition. Moreover, counsel for Bi-State had the opportunity to cross-examine Mr. Buchanan. The fact that Bi-State's counsel failed to more fully cross-examine Mr. Buchanan is no ground for reversal.

■ The trial court also properly sustained Norman Lines' objection to Bi-State's Exhibits Y and Z. In this instance, Bi-State sought to introduce these exhibits to impeach Mr. Buchanan by prior inconsistent statements. Prior inconsistent statements are hearsay and they are admissible only for the purpose of impeachment and are not to be taken as substantive and affirmative proof of the facts stated therein. *Rogers v. Fiandaca*, 491 S.W.2d 560, 565 (Mo.1973). Further, the impeached witness, must be given an opportunity to explain the inconsistency. *Ebert v. Metropolitan Street Railway Company*, 174 Mo. App. 45, 160 S.W. 34, 37 (1913). In the

present case, there was no opportunity to place Mr. Buchanan on the stand to explain any possible inconsistent statements. As an Illinois resident, he was unavailable at trial. Therefore, it was incumbent on Bi-State to impeach him at the time the deposition was taken. That was the only time inconsistent statements could be explained because in cases "where a deposition is introduced, inconsistent statements may not be shown unless a proper foundation for them was laid in the deposition." *Murphy v. State*, 636 S.W.2d 699, 701 (Mo.App. 1982).

We last address the crucial issue of Bi-State's appeal, whether nine identical jurors must agree both on the determination of negligence and on the apportionment of damages. This issue is one of first impression in Missouri. For guidance, we look to the jurisprudence of our sister states.

In *Ward v. Weekes*, 107 N.J.Super. 351, 258 A.2d 379, 380 (App.Div.1969), the New Jersey court held that although the same ten of twelve jurors did not agree on the issues of liability and damages, the ten-two jury verdict on each issue was valid. The court further stated:

The instant case is typical of the many auto accident cases tried daily in the courts. The dispositive issues in these cases are usually negligence, contributory negligence and damages. A typical charge explains the function of the court and jury, defines the applicable law, and suggests to the jury that (a) they first consider the issue of defendant's negligence, and if they absolve him from responsibility, they need go no further; (b) if they find defendant to be negligent as defined to them, they should then consider the issue of plaintiff's contributory negligence, and if they find him to have been negligent as defined, then again they need go no further; and (c) if they find defendant to have been negligent and plaintiff free from contributory negligence then, and only then, should they consider the issue of damages. The charge generally concludes with the explanation that their verdict may be no

cause for action if they find for defendant, or one lump sum of money if they find for plaintiff; and that their verdict may be rendered as soon as at least ten of them are in agreement. We are unaware of any charge, nor has any been brought to our attention, which instructs the jury to vote separately on each issue and that at least the same ten must agree on all issues.

In *Naumburg v. Wagner*, 81 N.M. 242, 465 P.2d 521, 524 (1970), the New Mexico Court of Appeals interpreted a state statute requiring ten jurors to agree upon a verdict to mean that at least ten jurors must agree on every material issue, but not necessarily the identical ten jurors in each instance. In this contributory negligence case, the court said:

We believe that our holding that any ten jurors in New Mexico may agree on any issue in support of a verdict best assures attainment of the purposes of less-than-unanimous verdicts, namely, overcoming minor disagreements that resulted in "hung" juries under the unanimity requirement.

The court added that "one can hardly argue that the result is less fair since twelve jurors must still participate. U.J.I. 16.4. Thus without sacrificing the traditional notion of justice, our interpretation of the less than unanimity rule ensures less waste of judicial time." *Id.* 465 P.2d at 524.

In *Tillman v. Thomas*, 99 Idaho 569, 585 P.2d 1280 (1978), the Idaho Supreme Court was confronted with the issue whether the same jurors must concur in resolving each issue essential to the outcome in order to render a verdict. The court rejected the identical juror rule as a "mechanistic" rule which needlessly increased the likelihood of mistrials. *Id.* 585 P.2d at 1283.

In *Forde v. Ames*, 93 N.Y.Misc.2d 723, 401 N.Y.S.2d 965, 966–967 (1978), the court held that the jury's verdict was valid although the same jurors did not join in determining liability and in assessing damages. In its memorandum opinion, the court stated:

The appropriate assumption in a case such as this is that when a juror is outvoted on the question of liability he will accept the outcome and continue to deliberate with the other jurors honestly and conscientiously to decide the remaining issues .... The result is that it is not necessary to require the same five jurors to agree on all material issues. It is sufficient that at least five jurors agree on every material issue.... The result is fair because six jurors must still participate in arriving at a conclusion as to each ultimate issue, i.e., negligence, contributory negligence and, if necessary, damages. .

In *United Farm Workers of America v. Superior Court of Merced County,* 111 Cal.App.3d 1009, 169 Cal.Rptr. 94 (1980), the jury poll revealed that nine identical jurors did not find both plaintiff and defendant negligent. Also, only eight of the jurors agreeing to the allocation of liability had found the plaintiff to be negligent. *Id.* 169 Cal.Rptr. at 95. In this comparative negligence case, the court ruled:

We hold that to find liability, the same nine jurors who find negligence on the part of a party must also find that negligence to be a proximate cause of the injury ..., but, it is not required that nine identical jurors find both plaintiff and defendant negligent. Jurors not concurring in a finding agreed to by three-fourths of the jury are not told to discontinue participating, drop out of negotiations, leave the room, not listen, or refrain from speaking during discussions.

*Id.* 169 Cal.Rptr. at 100.

Finally, in *Juarez v. Superior Court of Los Angeles County,* 31 Cal.3d 759, 183 Cal.Rptr. 852, 647 P.2d 128 (1982), the California Supreme Court affirmed the rule in *United Farm Workers.* The court held in this comparative negligence action that a juror who has disagreed with the majority on the issue of negligence may still vote on the issue of how to apportion damages among the parties. *Id.* 183 Cal.Rptr. at 853, 647 P.2d at 129. "To hold otherwise

would be to prohibit jurors who dissent on the question of a party's liability from participation in the important remaining issue of allocating responsibility among the parties, a result that would deny all parties the right to a jury of 12 persons deliberating on all issues." *Id.* 183 Cal.Rptr. at 857, 647 P.2d at 133.

In the instant case, the jurors who signed Verdict Form A finding both Bi-State and Norman Lines liable for Marlowe Powell's injuries were not the same jurors who signed Verdict Form C apportioning fault between Bi-State and Norman Lines. Of the ten jurors who signed Verdict Form A, Diane Thomas and Eva Wise did not sign Verdict Form C. Similarly, of the nine jurors who signed Verdict Form C, Ruby Coats and Lanice Paschall did not sign Verdict Form A. Bi-State argues that Ruby Coats and Lanice Paschall could not properly vote on the apportionment of fault because they did not find both Bi-State and Norman Lines liable for Marlowe Powell's injuries and, therefore, Verdict Forms A and C were inconsistent and legally impermissible. We disagree.

 We hold that if nine jurors find a party negligent, then any nine jurors may vote to apportion fault. Our decision is consistent with the jurisprudence of our sister states. To hold otherwise would forbid jurors who disagreed with the majority on an earlier issue from deliberating on subsequent related issues. This would needlessly complicate our system of trial by jury. A contrary holding would also cause economic loss to the public, litigants, and attorneys because of mistrials and would further court congestion and unfairness resulting from prolonged delay. *See Ward,* 258 A.2d at 381.

Moreover, before we overturn the deliberations of a jury, we must remember that "[o]ur system of justice revolves around our reliance on the wisdom of juries." *Fields v. Volkswagen of America, Inc.,* 555 P.2d 48, 55 (Okl.1976). We must trust that once a jury has fully resolved one issue, the jurors will honestly and indepen-

dently return a verdict on subsequent issues.

Accordingly, the judgment is affirmed.

CRIST, P.J., and SIMON, J., concur.